144

KATHERINE CHENAULT *v.* STATE OF ARKANSAS

5749                                        484 S.W. 2d 887

Opinion delivered October 2, 1972

*W. J. Walker* and *Harold L. Hall,* for appellant.

*Ray Thornton,* Atty. Gen., by: *Milton Lueken,* Asst. Atty. Gen., for appellee.

CONLEY BYRD, Justice. The appellant, Katherine Chenault, was tried and convicted of the first degree murder of her ex-husband for which the jury fixed her punishment at life imprisonment. For reversal of the conviction appellant argues that the trial court erred in allowing statements made by the appellant at the scene of the crime to be introduced into evidence thus violating her constitutional rights as established under the *Miranda* decision; and further that the trial court erred in permitting the State to introduce evidence as to the good character of the deceased.

Katherine Chenault, the appellant married William C. Chenault, the deceased, in 1968, and was divorced on June 24, 1971. This marriage was the appellant's eighth marriage and the deceased's second. On August 18, 1971, at 4:42 p.m., the Little Rock Police Department received a call to 2005 South Harrison, Little Rock, Arkansas. Patrolman Bobby Reynolds and Sergeant Leslie Gachot arrived at approximately 4:45 p.m. Sergeant Gachot testified that:

"When I got there a uniform officer had been dispatched and he was there at the house. Went inside the door and found the defendant standing by the wall of the kitchen, the body laying in Southwest corner of the front room. The defendant had a gun and I asked her to give me the gun and she told me that she shot him and I said, 'who is he?' She said, 'my husband,' and I went over to the body to see if he was still living or dead, and the man that, I couldn't feel any pulse on him. I went back to her and asked her what happened and she said, 'I shot him. I killed him.' I said, 'Don't say any more to me. Anything you tell me now will be used in Court against you,' and she said, 'Well, I know I killed him.' "

The testimony was corroborated by the uniformed officer Bobby Reynolds. Another officer, Larry Dill arrested the appellant and took her to police headquarters where the appellant was advised of her *Miranda* rights and she gave a statement. The appellant objected to the above testimony by the officers after the trial court had held a *Denno* hearing and ruled it admissible as being a spontaneous utterance.

On this point we agree with the trial court. The cases are legion on this point. The appellant has argued that the officers failed to warn the appellant of her constitutional right to remain silent as provided by the standard established in *Miranda*. In the present case the patrolman received a call at 4:42 p.m. and arrived at approximately 4:45 p.m. along with Sergeant Gachot, some three minutes later. The appellant made the statements immediately upon the arrival of the officers. A case directly in point recently before this court is *Stout* v. *State,* 244 Ark. 676, 426 S.W. 2d 800 (1968). In that case similiar statements of the accused were made at the scene of the murder to investigating officers and were admitted as being spontaneous utterances.

Further evidence of the spontaneousness of the utterances is readily demonstrated by the fact that while the police officers were investigating, the appellant answered her own phone and advised the party at the other end of the line that she had just killed her husband.

The appellant further contends that the trial court erred in permitting testimony to be introduced by the state as to the good character of the deceased.

In the opening statement to the jury the appellant's counsel, after telling the jury that appellant was pleading self-defense, made the following remarks in part:

". . .She is going to testify briefly as to the mistreatment, physical abuse that she received during the marriage. That she required medical attention due to this abuse. . . . The evidence of Mrs. Chenaults, of the treatment that Mrs. Chenault received at the hand of Mr. Chenault during the marriage will be sustained by witnesses, or friends of hers, or relatives that saw them together during the marriage. . . . However, I think that you will find from the evidence, that we are dealing with a split personality in Mr. Chenault. A Dr. Jekyl and Mr. Hyde type. Get drunk on Saturday night and sleep with a woman he is not married to that night and preach on Sunday morning. And that he had a very explosive temper."

The prosecution in chief called as its witness Mrs. Ernestine Mann Chenault, the deceased's first wife, who testified that her ex-husband had a Bachelor of Divinity Degree from Southern Methodist University; they had been married nineteen years; he had been a minister since 1954; he had never struck her; he had not had a drink in her presence and that she and the deceased planned on remarrying.

The appellant Katherine Chenault, on direct examination after the prosecution rested, testified, she and the deceased had traveled and stayed together as man and wife before their marriage; she had spent 11 days in the hospital in 1970, because the deceased had kicked her in the stomach; she spent 13 days in the hospital in 1971, for head injuries as a result of a visit by the deceased; the deceased had threatened to split her head with an ax, and after the divorce she had spent the night with the deceased drinking before he was to preach in Perryville the next morning.

The appellant relies on *Bloomer* v. *State*, 75 Ark. 297, 87 S.W. 438 (1905), for reversal, and this court has long recognized the rule that the State may not introduce the good character of the deceased before the defendant has placed it in issue. However, the defense following the outline of its opening statement furnished her evidence as to the bad character of the deceased. In *Mode* v. *State*, 234 Ark. 46, 350 S.W. 2d 675 (1961), the appellant, pleaded self-defence in a murder trial, and contended on appeal that the trail court committed fatal error in allowing the state to introduce evidence of the deceased's good character in rebuttal to defense testimony. This defense testimony related to threats, shooting, carrying a gun, fighting and other specific acts of misconduct of the deceased. This court stated:

> "We hold that when the defense offered all of the foregoing evidence, the defense thereby opened the door for the State to show on rebuttal the general reputation of the deceased. . .as a peaceable and law-abiding citizen. Such evidence certainly tended to rebut the defendant's evidence as to acts of bad conduct, turbulence and violence on the part of the deceased. Even though general reputation cannot be shown by acts of specific misconduct, yet when, under the claim of self-defense, there is offered—as here—such an aboundance of testimony of specific acts of bad conduct as to present a picture of the deceased being a violent and turbulent man, then the defense has, in effect, atacked the good reputation of the deceased and has opened the door for the State to show on rebuttal the general reputation of the deceased as a peaceable and law-abiding citizen."

Although, in the present case it was erroneous to permit the introduction of character testimony at the time it was introduced, the defense in pursuing her evidence as outlined in her opening statement to the jury, made the error harmless.

This court in *Midland Valley Rd. Co.* v. *Skinner*, 99 Ark. 370, 138 S.W. 969 (1911), a case involving a question of negligence concerning the death of a horse found near

148

the defendant's railroad, permitted testimony to be introduced without laying the proper foundation where the foundation was laid in later testimony. We sustained the verdict, this being harmless error. See also *Debin* v. *Texas Company,* 190 Ark. 849, 81 S.W. 2d 935 (1935).

Affirmed.